LHE/CJC:MEB/AS/DE/JR/CS
F. #2016R00481

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

DANIEL COMORETTO,

              Defendant.

- - - - - - - - - - - - - - - - X

20-M-125

TO BE FILED UNDER SEAL

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT

(T. 18, U.S.C., § 1956)

EASTERN DISTRICT OF NEW YORK, SS:

      STEVEN YOUNG, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

      Upon information and belief, in or about and between 2011 and October 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant DANIEL COMORETTO, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States:

      (a)    with the intent to promote the carrying on of one or more specified unlawful activities, to wit, felony violations of the Foreign Corrupt Practices Act, in violation of Title 15, United States Code, Sections 78dd-2 and 78dd-3 (the "Specified Unlawful Activities"), contrary to Title 18, United States Code, Section 1956(a)(2)(A); and

(b) knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of one or more specified unlawful activities, to wit: the Specified Unlawful Activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Section 1956(h))

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I have been a Special Agent with the FBI for approximately 16 years. During my career as a federal law enforcement officer, I have personally participated in numerous investigations, including the execution of search and arrest warrants, and the debriefing of cooperating witnesses and informants, all related to various types of financial crime, fraud and corruption. Among other federal crimes, I have investigated offenses involving conspiracies, public corruption, bank fraud and money laundering, as well as violations of the Foreign Corrupt Practices Act ("FCPA").

2. In addition to my training and experience, I am familiar with the information contained in this complaint and affidavit based upon, among other sources of information: (i) my own personal participation in the investigation, (ii) my review of documents,

---

[1] Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware. In addition, where I rely on statements made by others, such statements are set forth in part and in substance unless otherwise indicated.

records and reports, (iii) interviews of witnesses and (iv) discussions with other law enforcement personnel.

I. BACKGROUND

    A. The Foreign Corrupt Practices Act

    3. The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

    B. Entities and Individuals

    4. At all times relevant to this complaint and affidavit, Petroléos de Venezuela S.A. ("PDVSA") was a Venezuelan state-owned and state-controlled oil company. PDVSA and its subsidiaries and affiliates were responsible for exploration, production, refining, transportation and trade in energy resources in Venezuela. Among other products, PDVSA supplied asphalt to companies around the world. PDVSA also provided funding for various operations of the Venezuelan government. PDVSA and its wholly owned subsidiaries were "instrumentalities" of the Venezuelan government, as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A). PDVSA officers and employees were "foreign officials," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

    5. Asphalt Company was a company incorporated and based in the United States that stored, transported and traded asphalt.[2] Asphalt Company was one of the largest

---

[2] Certain entities' and individuals' names have been anonymized for the purposes of this criminal complaint. The identity of each of these entities and individuals is known to me.

asphalt providers in the world. Asphalt Company was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

6. Asphalt Trading was a company incorporated in the Bahamas and based in the United States that was one of a group of companies related to Asphalt Company. Asphalt Trading provided asphalt-related services to its customers. Asphalt Trading's principal place of business was in the same location as Asphalt Company's principal place of business in the United States. Asphalt Trading was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

7. Asphalt Company Affiliate was a company incorporated in Switzerland that was one of a group of companies related to Asphalt Company. Asphalt Company Affiliate had the same principals as Asphalt Trading and was incorporated after lending institutions withheld lines of credit from Asphalt Trading in or around 2012.

8. Joint Venture Co. was an asphalt trading joint venture between Asphalt Company and a European asphalt company.

9. Swiss Asphalt Company was a company incorporated in Switzerland that was in the asphalt business and, at times, a competitor to Asphalt Company. In or about and between 2012 and 2015, Asphalt Trading entered into various contracts with Swiss Asphalt Company to purchase asphalt.

10. Asphalt Company Two was a company headquartered in Puerto Rico that was in the asphalt business. It operated primarily in Latin America and the Caribbean. Asphalt Company Two was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

11.  The defendant DANIEL COMORETTO, a citizen of Venezuela, was a manager at PDVSA involved in the trading of asphalt in or about and between at least 2010 and 2013. During that time, COMORETTO was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

12.  PDVSA Official #1 was a dual citizen of Spain and Venezuela and was a trader and manager at PDVSA in or about and between 2008 and February 2015. During that time, PDVSA Official #1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2). PDVSA Official #1 was supervised at PDVSA by the defendant DANIEL COMORETTO in or about and between 2010 and 2013.

13.  Asphalt Company Employee was a citizen of Venezuela and legal permanent resident of the United States since at least 2017. Asphalt Company Employee was a trader at Asphalt Company in or about and between 2012 and 2018. Asphalt Company Employee's responsibilities included seeking contracts for Asphalt Company, Asphalt Trading and related companies with PDVSA. Asphalt Company Employee was an employee of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

14.  Asphalt Trading Employee was a citizen of the United States who worked in the United States for Asphalt Company and related companies from approximately 2006 through 2017. Asphalt Trading Employee's responsibilities included seeking contracts for Asphalt Company, Asphalt Trading and related companies with Petrobras and PDVSA. Asphalt Trading Employee was a "domestic concern," an employee of a "domestic concern," and an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

15.     Consultant was a citizen of Venezuela and a naturalized U.S. citizen as of approximately 2014 who worked at various times as an agent for Asphalt Company, Asphalt Trading, Asphalt Company Affiliate, Joint Venture Co. and Asphalt Company Two. Consultant was a "domestic concern" and an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

II.     THE BRIBERY SCHEME

16.     Based upon information provided by four cooperating witnesses involved in the bribery scheme,[3] a review of bank records and e-mail communications obtained from a variety of sources and involving the defendant DANIEL COMORETTO, and a review of contracts, agreements and other documents, I have learned that beginning in or about 2011 until at least October 2015, COMORETTO agreed with PDVSA Official #1 and Consultant to a scheme in which COMORETTO, PDVSA Official #1 and other PDVSA officials would solicit and accept bribes, facilitated by Consultant, from multiple companies, including Asphalt Company, Asphalt Trading, Asphalt Company Affiliate and Asphalt Company Two, to assist those companies in obtaining contracts to purchase asphalt from PDVSA. Specifically, based upon the information and evidence itemized above, I have learned the following:

---

[3] I know the identities of the four cooperating witnesses referred to in text. One of the cooperating witnesses who is a former PDVSA Official and a second cooperating witness made payments to the defendant DANIEL COMORETTO as part of the bribe scheme. Each of the four witnesses pled guilty to conspiracy to violate the FCPA or conspiracy to commit money laundering pursuant to written cooperation agreements with the government, and are cooperating in the hope of receiving a more lenient sentence in connection with their cases. The information provided by these cooperating witnesses has been corroborated by a review of bank records, e-mail and other messaging communications gathered during the investigation, and by information provided by other witnesses interviewed during the investigation. For example, I have reviewed bank records corroborating the payments set out in paragraphs 22 and 23 of this complaint.

A.  Bribes from Asphalt Company Two

17.  In or about 2011, Consultant, in his role as an agent of Asphalt Company Two, agreed with the principal of that company to pay bribes to the defendant DANIEL COMORETTO and PDVSA Official #1 to assist Asphalt Company Two in winning term contracts to purchase asphalt from PDVSA.

18.  Pursuant to this agreement, between approximately 2011 and at least December 2014, Asphalt Company Two paid Consultant a commission of approximately 45 cents for every barrel of asphalt that Asphalt Company Two purchased from PDVSA. In or about and between 2012 and 2013, Consultant paid a portion of these commission payments to the defendant DANIEL COMORETTO as bribes. In addition, in or about and between 2012 and December 2014, Consultant made bribe payments to PDVSA Official #1 with the knowledge and understanding that PDVSA Official #1 was to share approximately 50 percent of these bribe payments with COMORETTO. To disguise the bribe payments, COMORETTO and PDVSA Official #1 directed Consultant to transfer money to various bank accounts, including to bank accounts in Panama, in the names of shell companies controlled by PDVSA Official #1.

B.  Bribes from Asphalt Company Group and Affiliated Entities

19.  Following a dispute between PDVSA and Asphalt Company that occurred prior to 2012, PDVSA refused to sell asphalt to Asphalt Company or companies related to Asphalt Company. To circumvent this prohibition, Asphalt Company and Swiss Asphalt Company agreed that Swiss Asphalt Company would purchase asphalt from PDVSA at the request and direction of Asphalt Company and then resell that asphalt to Asphalt Company at a small premium. At this same time, in or about 2012, and continuing to in or about October 2015, the defendant DANIEL COMORETTO and PDVSA Official #1 agreed with Consultant, Asphalt

Company Employee, Asphalt Trading Employee and an executive at those companies that Consultant would pay bribes to COMORETTO and PDVSA Official #1 on behalf of Asphalt Company, Asphalt Trading and Asphalt Company Affiliate in exchange for their assistance in obtaining and retaining contracts for Swiss Asphalt Company with PDVSA to purchase asphalt in order for Asphalt Company, Asphalt Trading and Asphalt Company Affiliate to then purchase that asphalt from Swiss Asphalt Company.

20. As a part of this arrangement, from approximately 2012 to October 2015, Asphalt Company and Asphalt Company Affiliate paid Consultant a commission of approximately 45 cents for every barrel of asphalt that Swiss Asphalt Company purchased from PDVSA and provided to Asphalt Company and affiliated entities. Consultant, in turn, paid a bribe to PDVSA Official #1 for each barrel of asphalt PDVSA sold to Swiss Asphalt Company, approximately 50 percent of which, from approximately 2012 through at least January 2015, PDVSA Official #1 was to share with defendant DANIEL COMORETTO. To disguise the bribe payments, COMORETTO and PDVSA Official #1 directed Consultant to transfer money to various bank accounts, including to bank accounts in Panama, in the names of shell companies controlled by PDVSA Official #1.

    C.    <u>Bribe Payments to Shell Accounts to Promote and Conceal the Scheme</u>

21. In or about and between September 2013 and January 2015, both dates being approximate and inclusive, Consultant wired a total of approximately $518,000 in bribe payments on behalf of Asphalt Company, Asphalt Trading, Asphalt Company Affiliate and Asphalt Company Two from accounts that Consultant controlled in the United States and Panama to Panamanian bank accounts held by a shell company that were controlled by PDVSA Official #1. In my training and experience, and based upon my knowledge of this case, these

Panamanian bank accounts held by a shell company were used in part to conceal the source and nature of the bribe payments that were made to PDVSA officials. Further, the payments were bribes, and thus promoted the criminal scheme.

22. In or about and between April 2012 and September 2014, both dates being approximate and inclusive, PDVSA Official #1 and Consultant wired a total of approximately $229,000 in bribes to the defendant DANIEL COMORETTO. Approximately 22 of these wires were sent through bank accounts located in New York City, which payments passed through the territorial waters of the Eastern District of New York. PDVSA Official #1 and Consultant made the majority of the payments using bank accounts located outside the United States, specifically in Panama, and, following transfers between bank accounts held by PDVSA Official #1 in Panama, the bribes were wired into an account that COMORETTO held at Bank of America in the United States. In particular, PDVSA Official #1 wired a total of approximately $186,000 in bribery payments from accounts he controlled in Panama to a Bank of America account in the name of COMORETTO to promote the scheme.

23. Payments in furtherance of the bribery scheme continued until at least October 2015. For example, on October 6, 2015, Asphalt Company wired $12,059.40 to Consultant in connection with a purchase of asphalt from PDVSA.

III.   CONCLUSION

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant DANIEL COMORETTO so that he may be dealt with according to law.

IT IS FURTHER REQUESTED that, because public filing of this document at this time could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, all papers submitted in support of this application, including the complaint and arrest warrant, be sealed until further order of the Court.

STEVEN YOUNG
Special Agent
Federal Bureau of Investigation

Sworn to before me this
6th day of February, 2020

THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK